UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CASEY BOREK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 11 C 1154 |
| | ) | |
| SUDLER PROPERTY MANAGEMENT, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

Now before the Court is Defendant Sudler Property Management's ("Sudler")

motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the

following reasons, the motion is granted.

## BACKGROUND[1]

Plaintiff Casey Borek ("Borek") is of Polish national origin, and has a Ph.D. in

mechanical engineering. At all times relevant to this lawsuit, Sudler served as the

management company to Ritchie Court, a condominium building in Chicago, Illinois.

Borek was an employee of Sudler's from July of 2006 until October of 2010. Borek

---

[1] The following facts are taken from the parties' respective statements and exhibits filed pursuant to Northern District of Illinois Local Rule 56.1. The Court reviews each Local Rule 56.1 statement and disregards any argument, conclusion, or unsupported assertion found therein. *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006).

worked on the premises of Ritchie Court. As Sudler's employee, Borek was a member of a labor union ("Union").

Prior to his being hired, Borek was interviewed by Mary Pat Mirus ("Mirus"), a Sudler employee and On-Site Property Manager at Ritchie Court. Borek was hired as a janitor. In April of 2007, Mirus promoted Borek to the position of Assistant Engineer. As Assistant Engineer, Borek's duties included general building maintenance, repair, and sanitation duties. Borek also would tour the entire building on a daily basis to ensure that the building's pipes, locks, doors, lights, and water heaters were operational and in good shape. He would then report to the Chief Engineer on the building's condition.[2] Mirus again promoted Borek in April of 2009 to Chief Engineer. The Chief Engineer's duties included routinely communicating with the On-Site Manager and working with her to resolve building issues. Prior to his promotion, Borek felt that Mirus was happy with his work and that their relationship was good.

According to Borek, things began to change on April 14, 2009, when he injured his hand that day while on-duty. On May 8, 2009, Borek's physician cleared him to

---

[2] Borek attaches a declaration to his Local Rule 56.1(b)(3)(C) Statement of Additional Facts in which he states that he would only tour the building if the Chief Engineer was not present to conduct the tour. The Court disregards Borek's declaration to the extent that it is inconsistent with his unambiguous deposition testimony stating that he toured the entire building on a daily basis. *See Beckel v. Wal-Mart Assocs.*, 301 F.3d 621, 623 (7th Cir. 2002) ("Affidavits, though signed under oath by the affiant, are typically and here written by the affiant's lawyer, and when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy.").

return to work. Upon his return, Borek felt that Mirus treated him differently than she had before his injury. For example, Borek maintains that Mirus would complain that she could not understand his English. When communicating over the radio on a frequency which other employees could listen, Mirus would mock Borek by laughing and openly asking, "did anybody understand what Casey said?" Borek maintains that Mirus never complained that she did not understand him prior to his injury. Mirus testified that she would routinely ask employees to repeat themselves if she did not understand what they said, and that she never singled Borek out for derision.

Sudler maintains that on October 1, 2009, a document entitled "Ritchie Court Condos Memorandum" was issued to Borek's employee file. The memorandum listed a host of problems with Borek's performance, including lack of communication regarding issues in the building, lack of leadership, and inability to manage building emergencies. Mirus testified that she discussed the performance issues with Borek, but that she did not recall if she issued the memorandum to him personally. Borek denies having received the memorandum at any time prior to discovery, and denies that Mirus discussed the performance issues listed in the memorandum.

Borek experienced chest pain, allegedly as a result of Mirus's treatment, and scheduled heart tests on October 26, 2009 at Illinois Masonic Hospital in Chicago. Borek maintains that he told Mirus about his upcoming visit to the cardiologist, and that

she responded by making a circle around her head and telling him that he should go to a psychiatrist instead. Mirus denied doing so.

Some time in October of 2009, Borek met with Hank Binswanger ("Binswanger"), a Sudler manager, and resigned as Chief Engineer in order to work as Assistant Engineer. Borek did this because as Assistant Engineer, he would not be required or expected to communicate directly with Mirus. Borek remained as Assistant Engineer until his termination in October of 2010. Dino Quirate ("Quirate"), a Sudler employee, took over as Acting Chief Engineer, and remained in that position until Borek's firing.

Borek went on vacation from September 28, 2010 until October 10, 2010. On September 27, 2010, Rick Summers ("Summers") began training with Quirate to take over as permanent Chief Engineer. When Borek returned to work on October 11th, he met with Binswanger, Mirus, and Summers and was handed an employee disciplinary report, which was dated September 30, 2010 ("September 30th Report"). The document indicated that Borek was being suspended for dishonesty, quality of workmanship, and conduct endangering safety or health of others. The memorandum attached to the September 30th Report stated that Summers discovered that a valve had been stripped and was otherwise damaged, and that the valve needed to be changed immediately in order to avert a potential emergency. The September 30th Report further indicated that

Summers determined that Borek and Quirate "had rounded the [valve] stem off to where it was impossible for the handle to be turned on or off." The memorandum noted that Quirate blamed Borek, and that he and Borek had last turned the stem with channel locks, damaging the stem. Borek refused to sign the September 30th Report or memorandum. He asked that he be shown the damaged pipe.

Borek noticed that the valve did not have a handle, and that the valve stem was freshly stripped. Borek explained that he could not have damaged the stem because it was freshly stripped and he had just returned from vacation. Borek had not previously told Mirus that this particular pipe was stripped. Borek maintains that this was because he had no knowledge that the pipes were damaged. Further, he maintains that the damaged pipes were not his fault because the Ritchie Court building was over 30 years old, and contains several older pipes. Borek claims that he was then terminated, while Sudler alleges that Borek was merely suspended at this time pending further investigation.

On October 14, 2010, Mirus received a letter from Mark Sperry ("Sperry") of Fettes, Love & Sieben ("Fettes"), a plumbing contractor. The letter states:

> The valves that are being replaced on 10/18 are not in working order due to employee mistreatment and neglect. By replacing these valves, you will have control of these risers for occasional shut downs and in case of an emergency.

The repairs cost the Ritchie Court Condominium Association $10,000, and required the building to be temporarily shut down.

Borek filed a grievance with the Union on October 13, 2010, which the Union denied. On October 19, 2010, with Summers and Mirus present, Binswanger told Borek that his employment was being terminated for damaging the valve stem and for not notifying any superiors of pipes that were corroding. Borek was the only active Assistant Engineer at the time he was discharged. Sudler also let go of Quirate: it offered him the choice of resigning, or being fired. Quirate chose to resign. He was eventually rehired by Sudler, but the record is unclear in what capacity.

On December 21, 2010, Borek filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against Sudler, alleging that his discharge was a consequence of disability and national origin discrimination on account of his Polish heritage. The EEOC issued Borek a Right to Sue letter on January 5, 2011. Borek then filed a two-count complaint pro se on February 18, 2011, in which he claimed that Sudler discriminated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Title VII of the Civil Rights Act of 1964 based on his Polish national origin , 42 U.S.C. § 2000e *et seq.* On December 27, 2011, the Court granted summary judgment to Sudler on the ADA claim, but denied its motion as to the Title VII claim. *See Borek v. Sudler Prop. Mgmt.*, No.

11 C 1154, 2011 U.S. Dist. LEXIS 149633 (N.D. Ill. Dec. 27, 2011).[3] Sudler now seeks

summary judgment on Borek's remaining Title VII claim for discrimination based on

his national origin.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, discovery, disclosures,

and affidavits establish that there is no genuine issue of material fact, and that the

movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Winsley v.*

*Cook Cnty.*, 563 F.3d 598, 602-03 (7th Cir. 2009). The moving party bears the initial

burden of showing that no genuine issue of material fact exists. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 325 (1986). If the movant succeeds, the non-moving party must

demonstrate with specific evidence that a genuine issue of fact exists in order to avoid

an adverse judgment. *Id.* A genuine issue of material fact exists when, based on the

evidence, a reasonable jury could find in favor of the non-moving party. *Trinity Homes*

*LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). In considering a motion

for summary judgment, the Court construes all facts and draws all reasonable inferences

in favor of the non-moving party. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir.

2010).

---

[3] This case was reassigned to this Court by Northern District of Illinois Order of the
Executive Committee on March 21, 2012.

**DISCUSSION**

**I.     Borek's Objection to Mirus's Amended Affidavit and Attached Exhibits**

Borek contends that paragraphs 5 through 10 of Mirus's amended affidavit and

five exhibits attached thereto should be excluded from consideration on hearsay

grounds.  A court may only consider admissible evidence when ruling on a motion for

summary judgment.  *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).  Hearsay

evidence at the summary judgment stage of litigation is inadmissible to the same extent

as it would be at trial.  *Id.*; *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir.

1997).

"Hearsay" is an out-of-court statement offered into evidence to prove the truth

of the matter asserted.  Fed. R. Evid. 801(c).  Hearsay is inadmissible unless an

exception applies.  *See Id.* 802.

Borek objects to the following statements from Mirus's amended affidavit:

5.     On or about October 1, 2009 I issued to Plaintiff a disciplinary
       memorandum identifying problems in communicating building
       issues, which I prepared and discussed with Plaintiff.  Attached as
       Exhibit 1 is a true and correct copy of this document.

6.     Within the next few months, Plaintiff requested to step down to the
       role of Assistant Engineer stating that it would be less stress on
       him, and I allowed him the opportunity to do so, as I wanted him to
       continue to work at the Association.

7.  In September of 2010, Rick Summers notified me that some of the building pipes had been severely damaged and stripped to the point that they could no longer be turned on and off.

8.  I investigated the situation and observed the damaged pipes in the photographs. Attached as Exhibit 2 are true and correct copies of the photos I received from Rick Summers regarding the pipe damage.

9.  I discussed the situation with Rick Summers and contacted outside plumbers Fettes, Love, Sieben who determined that an emergency shut off of the entire Association's pipes was necessary to replace these pipes, which cost the Association approximately $10,000. Attached as Exhibit 3 is a true and correct copy of a letter I received from the contractors who completed the Association pipe repairs.

10. Acting Head Engineer Dino Quirate advised me that Casey Borek had used a channel lock to turn the valve, and stripped the pipes.

Paragraphs 5 and 8 are admissible. They do not contain an out-of-court "statement;" *i.e.*, an oral, written, or nonverbal assertion. *See* Fed. R. Evid. 801(a). Rather, the paragraphs describe actions, and therefore should not be excluded. Paragraph 6 is also admissible as non-hearsay, as it refers to a statement made by Borek in an individual capacity. *See* Fed. R. Evid. 801(d)(2)(A). Finally, Paragraphs 7, 9 and 10 are admissible as non-hearsay. The statements in the paragraphs are being offered to show the basis of Mirus's belief that Borek had damaged the pipes, not to prove that he actually damaged the pipes. As such, the paragraphs are admissible.

Borek also challenges the admissibility of five exhibits on hearsay grounds. The exhibits include the October 1, 2009 disciplinary memorandum (Exhibit 1), photographs of corroded pipes taken by Summers (Exhibit 2), a letter written by Sperry diagnosing Ritchie Court's plumbing problems (Exhibit 3), Borek's termination form dated October 19, 2010 (Exhibit 4), and Mirus's notes from her investigation into Ritchie Court's plumbing problems (Exhibit 5).

Exhibits 1 through 4 are admissible under the "business records" exception to the hearsay rule. *See* Fed. R. Evid. 803(6). The exception permits the admission of

> [a] record of an act, event, condition, opinion, or diagnosis if the record was made at or near the time by – or from information transmitted by – someone with knowledge; the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; making the record was a regular practice of that activity; all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

*Id.* "To be admissible as a business record, a document must have sufficient indicia of trustworthiness to be considered reliable." *Komal v. Arthur J. Gallagher & Co.*, 833 F. Supp.2d 855, 859 (N.D. Ill. 2011) (*quoting Woods v. City of Chi.*, 234 F.3d 979, 988 (7th Cir. 2000)). The proponent of the business record normally meets the reliability threshold by attaching an affidavit sworn to by a person qualified to introduce the

record as evidence at trial, such as the document's custodian or anyone with personal knowledge of the record's contents. *Woods*, 234 F.3d at 988.

Exhibits 1 through 4 are records and photographs made contemporaneously with the events that they purport to substantiate. Mirus attests to the veracity and the timeliness of each of the exhibits in her amended affidavit. Borek raises no serious challenge to the integrity of the exhibits, nor does he complain that he was not given sufficient notice of Sudler's intent to submit these documents into the record. *See* Fed. R. Evid. 902(11). Borek's objection as to Exhibits 1 through 4 is overruled.

However, the Court will not consider Exhibit 5. Mirus's investigation notes are not dated or signed, and the amended affidavit is silent as to when the investigation notes were created. The investigation notes are therefore not sufficiently trustworthy to warrant our consideration. Borek's objection as to Exhibit 5 is sustained.

## II.     Borek's Title VII Claim

### A.     Direct Method of Proof

Title VII prohibits employers from discharging an individual because of the person's national origin. 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff may prove his claim of national origin discrimination under either the direct method of proof or the indirect method. *Montgomery v. Am. Airlines*, 626 F.3d 382, 393 (7th Cir. 2010). Under the direct method, the plaintiff must use either direct or circumstantial evidence

to show that the employer's employment decision was discriminatory. *Id.* Direct evidence typically comes in the form of a decision-maker's admission that she acted based on discriminatory animus. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). A plaintiff may also establish discrimination with circumstantial evidence comprising a "convincing mosaic" that "allows a jury to infer intentional discrimination by the decisionmaker." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). Circumstantial evidence is classified into three categories: (1) suspicious timing, ambiguous statements, behavior toward or comments directed at employees in the protected group from which an inference of discriminatory intent may be drawn; (2) evidence that employees similarly situated to the plaintiff except for his protected characteristic received systematically better treatment; and (3) evidence that the plaintiff was qualified for but failed to receive desired treatment, and the employer's stated reason for the difference is unworthy of belief. *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). Circumstantial evidence "must point directly to a discriminatory reason for the employer's action" to establish a prima facie case of discrimination under Title VII. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Borek alleges that Sudler's stated reasons for terminating his employment are false, and that this creates a "convincing mosaic" of discrimination. Borek's argument

is without merit. Circumstantial evidence under the direct method "must point directly to a discriminatory reason for the employer's action." *Id.* Here, after obtaining Mirus's recommendation, Binswager told Borek that he was being discharged because he and Mirus believed that he was to blame for the pipe damage and resulting repairs. Borek submits no evidence suggesting that Sudler's management acted deceptively. Moreover, even if we were to accept Borek's theory that Sudler's evidence is fraudulent, nothing in the record points directly to a discriminatory motive behind his termination. The piece of evidence most closely resembling discriminatory animus – Mirus allegedly laughing and mocking Borek's English – does not, by itself, create an inference of discrimination recognized under Title VII. *See Lochard v. Provena Saint Joseph Med. Ctr.*, 367 F. Supp.2d 1214, 1221 (N.D. Ill. 2005) (granting summary judgment for employer, noting that the employer's "written statement consisted of no more than an isolated stray remark noting [the plaintiff's] heavy accent and the fact that he had difficulty understanding [the plaintiff] . . . does not constitute direct evidence of intentional discrimination . . . ."). Accordingly, we find that Borek does not establish a claim for discrimination under the direct method of proof. We proceed to assess his claim under the indirect method.

**B.     The Indirect Method of Proof**

A Title VII plaintiff may establish a prima facie case for national origin discrimination under the indirect, burden-shifting method of proof first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 681 (7th Cir. 2007). The indirect method of proof requires the plaintiff to carry the initial burden of establishing a prima facie discrimination claim by showing that: (1) he is a member of a protected group; (2) his job performance met the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably. *Goodwin v. Bd. of Trs. of the Univ. of Ill.*, 442 F.3d 611, 617 (7th Cir. 2006). If the plaintiff establishes each element, the burden shifts to the defendant to assert a legitimate, nondiscriminatory reason for the challenged employment action. *Id.* If the defendant carrier its burden, the plaintiff must submit evidence that would enable a jury to find that the employer's reason for the adverse employment action was a pretext. *Id.* at 618.

Sudler acknowledges that Borek's Polish national origin confers upon him protected status under Title VII, and that his discharge was an adverse employment action. Sudler argues that it is entitled to summary judgment because Borek's performance was not meeting its legitimate expectations. Further, Sudler argues that

even if Borek can establish a prima facie case, he cannot show that Sudler's stated reasons for his discharge – his allegedly stripping and neglecting the Ritchie Court building pipes – were pretextual.

Borek asserts that Sudler's reasons for his firing were a pretext to a discriminatory motive. Where a plaintiff argues that he has performed satisfactorily and asserts that the employer's reasons for his discharge are fabricated, the second prong and the pretext element of the *McDonnell Douglas* analysis merge, since both prongs are resolved by determining whether the defendant's reasons for the plaintiff's discharge are phony. *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006). A plaintiff shows that an employer's nondiscriminatory reason for terminating his employment was pretextual with evidence indicating that (1) the employer's nondiscriminatory reason was dishonest, and (2) the employer's true reason was based on a discriminatory motive. *EEOC v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006). At the summary judgment stage of litigation, however, a plaintiff need only offer evidence supporting an inference that the employer's nondiscriminatory reason for its action was dishonest. *Id.*

We first determine whether Sudler's justification for discharging Borek was nondiscriminatory. Sudler asserts that it fired Borek because he damaged the pipes and allowed them to deteriorate without notifying Mirus or Quirate. This led Ritchie Court

to temporarily shut down the water supply and undergo expensive repairs. We find that Sudler's stated reasons for firing Borek are benign, and we proceed to examine if Borek submits evidence sufficient to support an inference of dishonesty on Sudler's part.

Borek argues that Sudler's reasons for his dismissal are untrue. He claims that the October 19, 2010 memorandum was fabricated for the Union grievance proceeding. However, the only evidence Borek submits to support this argument is Sudler's failure to submit the memorandum attached to the September 30th Report with its Local Rule 56.1 statement. Borek claims that evidence of the October 19th memorandum's falsity lies in its lack of consistency with the September 30th memorandum: namely, that the September 30th memorandum refers to the stripping of the cutoff valve and that a return valve was not holding, while the October 19th memorandum lists corroding pipes in addition to the valve problem as the impetus for Borek's termination.

We decline to infer that the October 19th memorandum is fraudulent merely because it contains additional reasons for his termination. Borek submits no affirmative evidence that the October 19, 2010 memorandum is a product of deception. Further, Borek's theory that Sudler was attempting to hide something from him or from the Court is foreclosed by the fact that Sudler produced the September 30th memorandum during the course of discovery. Even if we were to accept Borek's invitation to find that the October 19th memorandum was created post-mortem solely for the purpose of

justifying his discharge at the union grievance hearing, Borek fails to submit any

evidence that Sudler did not believe the reasons found therein to be true. For these

reasons, we find that no rational jury would find in Borek's favor based on the minor

inconsistencies between the two memoranda.

Borek's allegation that the October 1, 2009 memorandum and Mirus's amended

affidavit are fraudulent is equally unavailing. Borek asserts that the October 1st

memorandum is fabricated because Mirus never showed it to him at the time. Borek

makes no claim that he had limited access to his employment file, or that Sudler was

required to notify him whenever new materials were added to it. Borek's not having

viewed the October 1st memorandum prior to this lawsuit alone thus does not provide

sufficient grounds of the memorandum's falsity.

Nor does the amended affidavit indicate that Sudler's stated reasons for firing

Borek were false. Borek argues that Mirus's corrections to her original affidavit

demonstrate Sudler's discriminatory motives. In essence, the amended affidavit

clarifies that (1) Rick Summers snapped the photographs of corroded pipes alone, not

with Mirus; (2) Mirus consulted with Summers and Fettes's plumbers to determine that

emergency repairs were necessary to the building's pipes, instead of Mirus coming to

that decision alone; (3) Mirus did not discuss with Borek that his neglect of the

building's pipes endangered the building; and (4) Mirus agreed with Binswanger's

decision to terminate Borek, rather than Mirus cooperatively making that decision with Binswanger. The changes to the amended affidavit do nothing to show that Sudler's reasons for firing Borek were false. They merely provide greater detail to issues at the periphery of the heart of the matter: whether Sudler's stated reasons for firing Borek were a cover for a discriminatory motive. No rational jury could infer a discriminatory motive behind Borek's firing based only on these ancillary changes.

Because Borek submits no triable issue of fact as to Sudler's stated nondiscriminatory reasons for his dismissal, Borek does not state a prima facie case for national origin discrimination under the indirect method. Sudler's motion for summary judgment is granted.

## CONCLUSION

For the foregoing reasons, Sudler's motion for summary judgment is granted.

_____
Charles P. Kocoras
United States District Judge

Dated: ___January 23, 2013___